Gocio *v.* Gocio.

4-7127, 4-7128 (consolidated)    177 S. W. 2d 742

Opinion delivered January 10, 1944.

*E. W. Brockman, Jeff R. Rice* and *Owens, Ehrman & McHaney,* for appellant.

*Vol T. Lindsey,* for appellee.

GRIFFIN SMITH, Chief Justice. B. L. Gocio, twice married, moved from Reydell Plantation in Jefferson County and became a citizen of Bentonville in 1924, where for more than thirteen years he operated the Massey Hotel. He died January 18, 1938, survived by a widow and seven children.[1] Joseph and Charles Gocio, brothers, by the half blood, were named executors of their father's will. The testator's widow elected to take under statutory rights and her renunciation was made a matter of record.

Dr. E. P. Notrebe was a nephew of B. L. Gocio. He died January 3, 1928.

Two appeals are presented. In Cause No. 9771, Benton Chancery Court, (our No. 7127) Maggie Gocio, widow of B. L. Gocio, and Amelia Hardister, daughter and beneficiary under B. L. Gocio's will, sued Joseph and Charles Gocio individually, and as executors of the estate of B. L. Gocio. From certain adverse holdings in

---

[1] Issue of the first marriage were Joseph and Jennie Gocio, and their three sisters who became Annie Haigh, Ida Haizlip, and Agnes Wilson. Children of the second marriage were a son, Charles Gocio, and a daughter, who became Amelia Hardister.

the decree Joseph Gocio has appealed. In Probate Court proceedings bearing no docket number, but reaching this Court as Cause No. 7128, Joseph Gocio has appealed from certain orders and a final judgment.[2]

In March, 1942, it was sought by prohibition to have this Court halt proceedings in the Benton Probate and in the Benton Chancery Courts, on the ground that they were without jurisdiction, or were acting in excess of jurisdiction. *Gocio* v. *Seamster, Judge,* No. 6655, 203 Ark. 937, 160 S. W. 2d 194, and No. 6656, 203 Ark. 944, 160 S. W. 2d 197. Writs were denied.

In Cause No. 6655 the opinion says, in respect of Joseph Gocio: "It appears to us that petitioner is exceeding his authority in assuming complete control in said estate to the exclusion of his co-executor. Both are equally responsible for the proper administration thereof and the Court should require joint action in its management. . . ."

In Cause No. 6656 this statement appears: "Petitioner has refused, [in the Probate Court] to account for certain assets presumptively belonging to his testator, but title to which is claimed by him. . . ."

Appellees, in their brief, assert that B. L. Gocio was a man of considerable wealth, part of his property consisting of apartments in Colorado at Denver, having a value of $125,000. The testator, it is agreed, owned eleven-twelfths of this property, the remaining interest of eight and a third percent having been owned by appellant. B. L. Gocio is alleged to have held $76,000 in notes secured by Chicago realty,[3] and in addition owned the Massey Hotel at Bentonville, a sixth interest in the Notrebe estate, and had other assets. Appellant was executor of Notrebe's will, which disposed of property valued for estate and inheritance tax purposes at more than $172,000. Although, according to appellees, the Gocio estate had been in process of administration for

---

[2] It was stipulated that evidence heard in the Probate proceedings and in the Chancery litigation was identical other than in respect of the challenged allowance of $10,000 as attorney's fee.

[3] Ownership of the so-called Chicago notes is one of the matters in issue.

more than five years, the widow had received but $500, ". . . except what has been paid to her as rents from the Denver apartments," and but small sums had been paid to Amelia Hardister and Charlie Gocio.

Appellant and Charles Gocio qualified as executors March 8, 1938. Charles contends that the only assets coming into his hands were two notes executed by Joe Gocio to his father, one for $3,067.50, the other for $1,000; also a cancelled check indicating that B. L. had loaned Joe $5,000. Appellant claimed the items had been paid, but when sued he pleaded limitation. On this issue the Court found in appellant's favor, and there was no direct or cross appeal.

The material issues, says appellant, are ownership of Note No. 38 and a one-third interest in Note No. 37, secured by the Chicago trust deed; also what amount should be charged to appellant as surviving partner of the firm of Gocio & Gocio, owners of the Denver apartments; and, finally, the right of an Arkansas Court to question an accounting consummated in a Colorado Probate Court, from which no appeal was taken.

. . .

Prior to March 12, 1924, B. L. Gocio and Dr. Notrebe owned apartments in Chicago. On that date they sold to Rose and Henry Bluhm. Thirty-six notes for $1,500 each, consecutively numbered, and two for $38,000 each, were made payable to the makers and by them indorsed prior to delivery to the grantors. Appellant says Dr. Notrebe took half of the notes as his share, "even numbers" going to Gocio. Appellees concede that under the evidence this is possible. The transaction would have placed Note No. 37 with Dr. Notrebe and Note No. 38 with his uncle. At various times default occurred in payment of principal and interest; but, when the controversy we are called upon to review occurred, all of the $1,500 notes had been paid, with interest, leaving Notes Nos. 37 and 38 outstanding. Number 37 was entitled to certain credits. The notes matured March 12, 1934.

Testimony of Burton T. Gobble, Assistance Attorney General and Inheritance Tax Collector for Colorado, was to the effect that on May 3, 1928, Joseph Gocio, as executor of the estate of E. G. Notrebe, filed a verified statement showing that certain transfers of property occurred before death. They were (a) "To Benjamin L. Gocio, an uncle who stood in the relation of parent to deceased, from infancy, the following: Note of Rose and Henry J. Bluhm, dated March 12, 1924, due March 12, 1934, interest six percent, payable quarterly, face $38,000, accrued December 12, 1927, to Jan. 3, 1928 (22 days) $139.26; total, $38,139.26. (b) To Joseph Gocio, cousin, the following: Twelve notes of Rose and Henry J. Bluhm, each dated March 12, 1924, one due every six months beginning March 12, 1928, interest six percent, payable quarterly, each for the sum of $1,500. Total, $18,000. Accrued interest December 12, 1927, to Jan. 3, 1928, (22 days) $66; total, $18,066."

E. P. Buttram, Benton County Clerk, testified to the inventory filed by appellant as executor of his father's estate. It was dated May 15, 1939, and listed as realty the Massey Hotel, valued at $25,000.

Under "personal property" the executor charged himself with $7,509.75 cash in a Denver Bank, and "Note No. 37 in the principal sum of $38,000, . . . estimated value $28,560." An item of $2,636.40 was listed as being due from the Notrebe estate. When exceptions were filed to appellant's First Annual Settlement, he moved to quash, alleging: "Your executor is the owner in his individual capacity of all outstanding obligations against [the] Chicago property except Note No. 37; and any claim by the exceptors to ownership of any obligation against such Chicago property [other than as conceded] would constitute a disputed title to such obligations, which this court would have no jurisdiction to try."

Charles Gocio testified that appellant, in the fall of 1938, told him the estate had $76,000 of the Chicago notes, ". . . but Joe said he didn't think they were worth very much."

Appellant claims his father, in August, 1925, gave him Note No. 38. The explanation goes back to old transactions. Prior to April 11, 1916, Joseph Gocio and Dr. Notrebe owned Reydell Plantation. B. L. Gocio and Dr. Notrebe were partners in Colorado under the first name of Notrebe and Gocio. They were associated with Ben Chaney in an incorporated ranch at Ridgeway known as Van Hagan Land & Live Stock Co. Desiring to get rid of Chaney, Dr. Notrebe and B. L. Gocio persuaded Joseph to sell to Chaney his half interest in Reydell. Chaney delivered to appellant 200 shares of the Van Hagan stock, having a par value of $100 per share.

Stressing his claim to Note No. 38, appellant says that in August, 1925—almost two and a half years prior to Dr. Notrebe's death—B. L. Gocio, who then owned notes of the Bluhm series, delivered to appellant the $38,000 item with the statement, "I am going to give you part of these notes." The father had always felt that appellant did not get a "fair deal" when he sold his interest in Reydell. There was the further explanation that B. L. did not think the notes had very much value.

Charles A. Gordon, Simmons National Bank trust officer in 1925,[4] testified that on June 18 of that year Joe Gocio left with the bank eighteen of the Bluhm notes, seventeen for $1,500, and Note No. 38 for $38,000. All bore "even" numbers. On August 12 another receipt was issued in which it was stated that ". . . of the above mentioned $1,500 notes, eight (Nos. 4, 6, 8, 10, 12, 14, 16, and 18) have been pledged as collateral to note of B. L. Gocio for $8,000. . . . Notes Nos. 20, 22, 24, 26, 28, 30, 32, 34, 36, for $1,500 each, and note No. 38 for $38,000, are held by this bank for collection and credit for account of Joe Gocio. . . ."

In January, 1928, appellant left at the bank twelve $1,500 notes, and at a later time left Note No. 37 for collection. All appear to have been of the "odd" numbers, and probably came through Dr. Notrebe. Proceeds from

[4] Gordon is now a vice-president and cashier of Simmons National Bank at Pine Bluff.

collections were deposited to the account of Joseph Gocio. Subsequent to the B. L. Gocio-Simmons Bank transaction and pledge of the eight $1,500 items as collateral, the loan was renewed in part with a note signed "B. L. Gocio, by Joe Gocio." The total of all even-numbered notes received by Gordon was $63,500.[5]

. . .

There is testimony tending both to affirm and deny appellant's ownership of the $38,000 note. On March 8, 1940, appellant instructed the bank that as to future collections from the notes, a third of the proceeds should be credited to the personal account of Joe Gocio and two-thirds to Joseph and Charles Gocio, executors.

A "First Annual Settlement" was filed May 13, 1939—sixteen months after the testator's death. Appellant, in a "lump sum," took credit for $1,477.05, on an unitemized claim marked, "To Joe Gocio for moneys advanced to B. L. Gocio during his lifetime." In the meantime appellant, as surviving partner of the Denver firm of Gocio & Gocio, had been operating the apartments. Receipts mentioned in the first report presumptively covered all collections through April 21, 1939, and amounted to $4,266.67. But, it was stated, this income was from Note No. 37.

Another item was "By deposit in Denver National Bank January 1, 1938, $7,509.75." But January 1 was eighteen days before B. L. Gocio died, and therefore the entry could not represent collections by appellant as executor. Indeed, no such contention was made. Collections from Note No. 37, and the bank balance, amounted to $11,776.42, while credit (including the $1,477.05 item in appellant's own favor) amounted to $12,416.11. There was the comment: "In addition, . . . the estate is due the sum of $2,636.40 as the share of B. L. Gocio in the estate of E. P. Notrebe, and there

[5] Only Note No. 2 of the even numbers seems to have been missing from the list left with the bank. Had this item been included, the transaction would have represented half of the notes issued by the Bluhms.

will be other moneys coming into the possession of your executor before the filing of a final settlement.''

. . .

On March 7, 1939, according to appellees' brief, appellant sent to his co-executor for approval and signature (the apparent intention being that it should be filed with the Probate Court) a ''report'' as of February 8, 1938, showing receipts and disbursements made by them since the date of their appointment. The first item was ''Collections, Chicago, $3,466.47.'' Second item, ''Collections, Denver, $7,509.75.'' Advances to widow and devisees, made as late as November 25, 1938, are included, aggregating $6,005.81. Balance on hand was shown to have been $4,970.61. Assuming there was an error in dating —and this is not explained—the fact remains that the item of $7,509.75 is the same amount alleged to have been on deposit in the Denver National Bank January 1, 1938, before the executors came into being.

If explanation should be that the report was intended for February 8, 1939, (and it is difficult to see how items paid in November, 1938, could have been anticipated for credit purposes) then no account was taken of collections made on the Denver apartments.

. . .

April 1, 1940, appellant filed his ''Second Annual Settlement'' and ''1940 Account Current,'' covering, in particular, receipts and disbursements incidental to the Denver property from January 1, 1938, to April 26, 1939.[6] Without reference by date to any former report, but beginning with ''By balance on hand last settlement, $815.12,'' appellant shows receipts from the Denver apartments to have been $36,477.77. But exceptions to appellant's First Annual Settlement had been filed July 3, 1939, and at that time no accounting of Denver receipts had been volunteered. Appellant's explanation was that he ''thought there had been another report''; also, that he did not have sufficient detail knowledge, hence, could

[6] On April 26, 1939, an ancillary administrator was appointed in Colorado.

not disclose information respecting these operations, which during certain seasons appear to have been quite profitable. When it was suggested to appellant by appellees' attorney on cross examination that he couldn't possibly have overlooked such a large item, the reply was, ''Well, that money was all kept out in the Denver bank. Everything had been regular, and it was checked out, and I can't see where there was anything wrong about that.''

Appellant testified that in August, 1925, he was handling business for his father. He also said that his father owned Notes Nos. 4, 6, 8, 10, 12, 14, 16, 18, notwithstanding the Simmons National Bank receipt indicated the entire series of ''even'' numbers (with exception of Number 2) was deposited by appellant, and proceeds were to be credited to him.

Although Dr. Notrebe did not die until January, 1928, he was stricken in Kansas City in December, 1927. Appellant says that the sick man, in a bedside transaction, gave Note No. 37 to B. L. Gocio and that he (appellant) was recipient of the twelve odd-numbered notes for $1,500 each then remaining unpaid. Accuracy of this statement is not challenged. It is then contended that the father, being anxious to realize currently on Note No. 37 (not then due) entered into an agreement with appellant whereby the thirteen notes were pooled, one-third of the proceeds to go to appellant, and two-thirds to his father. Contention is that thereafter this agreement was kept and the father was regularly paid as collections came in.

.  .  .

Appellant, as executor of the estate of Dr. Notrebe, sold the Doctor's Reydell plantation to J. B. Talbot, April 12, 1932, accepting notes for the purchase price of $25,000. The Notrebe estate was not closed for more than ten years. In March, 1939, the executor held $14,500 of purchaser's notes. It is in evidence that numerous unavailing efforts were made to sell the notes. He finally petitioned the County Court at Denver for permission to

sell for $7,500, and an order to that effect was made. The purchaser was Florence Gocio, appellant's wife. Sale was approved by the Colorado Court May 2, 1939. No exceptions were filed, and no appeal was taken. The Chancellor found that appellant made a profit of $10,500 in consequence of a refinancing transaction and that the B. L. Gocio estate was entitled to a sixth of that amount.[7]

Jo Nichol, president of Simmons National Bank, testified that the land comprising the sale to Talbot was between two bayous, subject to frequent overflows. In addition, it was heavily taxed by improvement districts. In 1939, he said, the notes were "not worth anything like par, and I would not have given $7,500 for them."

.   .   .

An item disallowed by the Court was $2,500, shown to have been loaned B. L. and Joseph Gocio in 1935 and 1936 by Miss Willie Nobles.[8] Her original checks were introduced, also notes executed in her favor. The Court seemingly disallowed the claims because not filed in a timely manner.

.   .   .

Two witnesses, well informed in respect of legal matters, testified on behalf of appellees' attorney that a fee of $10,000 would be reasonable. The Probate judgment allowed this sum, which should include appeals. Thirty-five hundred dollars was directed to be paid at once. It was shown that the Probate Court had directed Charles Gocio, as co-executor, to employ an attorney, and that Vol Lindsey's services were engaged in consequence of the Court's authority.

.   .   ..

In the Chancery decree it was found that the two notes in question—Nos. 37 and 38—including interest and

---

[7] Item III of Dr. Notrebe's will contained this provision: "I give, devise and bequeath one-sixth of the rest, residue and remainder of my estate to my uncle, Benjamin L. Gocio."

[8] Miss Nobles, a native of Parkdale, Arkansas, was originally employed by Dr. Notrebe as manager of his mercantile business at Reydell. She later went to Denver as manager of the "Pearl," and "La Katrine" apartments—the Denver properties.

all payments made prior and subsequent to B. L. Gocio's death, belonged to the estate except as to any portion expended by the owner before his death. A detail finding was that appellant had collected $4,341.01 on Note No. 37 prior, and $24,599.93 subsequent to B. L. Gocio's death, which sums had not been accounted for, but that $7,666.95 had been deposited to the joint account of Joseph and Charles Gocio in Simmons National Bank. Unpaid balance on the principal of this note was found to be $3,024.09, with interest from June 12, 1932. Foreclosure of the deed of trust was directed. Payments from Note No. 38 were directed to be credited to the executors.

Eleven-twelfths of net profits from operation of the Denver apartments from January 1, 1938, to April 30, 1939, were found to be $11,386.22, for which judgment was given.

The bank deposit as of January 18, 1938, was stated to be $3,802.75, eleven-twelfths of which is $3,485.79. It was decreed that this sum be paid.

Of the profits of $10,500 found by the Chancellor to have been realized by appellant through sale of the Talbot notes, the sixth interest due the Gocio estate was ascertained to be $1,950.83. In addition, there was a finding that Dr. Notrebe was the owner of an undivided half interest in certain Jefferson County lands not accounted for by appellant as administrator of the Notrebe estate. This half was sold to Roy W. Shepherd October 30, 1940, the whole interest having been acquired for $1,750. Fifty percent of this amount ($875) should be accounted for. The Court had jurisdiction of appellant in respect of that part of the distributive share (one-sixth) going to the Gocio estate. A sixth of the amount actually paid on the obligation of $875 was $66, for which judgment was rendered.

Appellant's claim that B. L. Gocio owed him personally $1,477.05 was disallowed. There was the further finding that if originally due, it was barred by the statute of nonclaim.

Detailed findings in respect of payments not in dispute were made by the Court, but since the decree is challenged as to particular items only, it is unnecessary to identify them further.

. . .

*First—The $38,000 Notes.*—While notations on the receipts given by Simmons National Bank are of evidential value in support of appellant's contention that notes aggregating $63,500 in value were left with directions that proceeds should be credited to the account of Joseph Gocio, it is also in evidence that appellant was acting for his father in many matters. It is significant that appellant fixes August 12, 1925, and *not* June 18 of that year, as the date from which his ownership of Note No. 38 stems. It was August 12 that eight of the $1,500 notes were attached as collateral to B. L. Gocio's bank obligation, which appellant renewed the following year.

Of more significance, however, is appellant's inventory of 1939, wherein he listed Note No. 37 as property of the estate, although in testifying his claim was that, with other Bluhm notes, it had been "pooled," the proportionate interests being a third to himself and two-thirds to his father. If this were true, the estate owned only an equity in Note No. 37. Whatever the facts may have been, they were known to appellant when he filed the inventory. His present explanations, being at variance with the sworn transaction, must be treated with reserve. As to the two notes, Charles Gocio testified that appellant, in the fall of 1938, told him the estate held $76,000 of the Chicago items. Conceding that this testimony came from an interested source, it is equally true that appellant, as a witness for himself, was not disinterested. On the whole we cannot say that the Chancellor's determination that appellant was not the owner of these notes is against the weight of evidence.

*Second—The Willie Nobles Notes.*—There is no serious contention that Miss Nobles did not advance

$2,500 to the firm of Gocio & Gocio. While it may be inferred that probably repayment occurred and that there was failure to take up the two notes, this inference —if in fact the circumstances may be said to be of that dignity—is not to be accepted in substitution of positive testimony that the obligations were outstanding when B. L. Gocio died. Presumptively the trial Court was of opinion that the claimant should have filed her account with the executor. As surviving partner, Joseph Gocio continued to operate the apartments. Indeed, this was the only method by which values could have been conserved. There is no suggestion that appellees urged partition, which would have required sale; nor is extravagance or mismanagement charged, other than that there was failure to report receipts and disbursements. The Nobles notes, being partnership debts, should have been paid by the executors. Of course Charles Gocio should have been consulted, but he was not. This did not prejudice his rights in the particular matter to such an extent that payment by appellant can be said to have been fraudulent. *Sutton* v. *McClain,* 193 Ark. 49, 99 S. W. 2d 236.[9]

*Third—Sale of the Talbot Notes.*—Judgment of the Colorado Court was entitled to full faith and credit. Admittedly it could be attacked for fraud practiced on the Court, but there is not sufficient proof that this occurred. A petition, asking permission to sell for $7,500, was filed and the prayer granted. Thereafter the sale was reported and a judgment of confirmation entered. The only circumstances to which appellees point are that the executor sold to his wife, and that subsequently, in a refinancing arrangement, a profit of $10,500 is indicated. Jo Nichol's testimony that the notes were not worth "anything like par,". and that he wouldn't have given $7,500 for them, is highly persuasive, and this with other evidence must control against the mere suggestions and circumstances that might, or might not, point to a planned conversion.

[9] For reference purposes see Act 263, passed without the emergency clause and approved March 26, 1941.

*Fourth—Proceeds of Denver Apartments.*—Complaint is that the judgment for $11,286.22 representing eleven-twelfths of profits realized from the apartments cannot be sustained by any reasonable construction of the evidence. It may be conceded that testimony is not satisfactory. On the other hand, it was appellant's duty to file with the Court a statement of his executorship, arranged in such manner that involved explanations would be unnecessary. Appellant has not shown wherein the judgment was incorrect.

*Fifth—Disallowance of Appellant's Claim of $1,-477.05.*—This was not an obligation relating to the cost of administration. Contention is that B. L. Gocio had borrowed this amount from Joseph. As originally filed the claim was vague and indefinite; in fact, wholly irregular. Finally, it was not presented within a timely manner.

*Sixth—Attorney's Fee.*—Lindsey, in testifying for himself, declined to answer when asked what fee had been paid him, or would be paid, by any of the appellees for legal services rendered, the explanation being that this involved a confidential relationship. A majority of the Court thinks the Chancellor should have required this disclosure.

Affirmed as to the first item, involving the $38,000 notes. Reversed as to the Willie Nobles Notes, this being the second item. Reversed as to the third item—the Talbot notes. Affirmed as to Item No. 4, pertaining to proceeds from the Denver apartments. Affirmed as to disallowance of appellant's claim of $1,477.77—Item No. 5. As to the sixth item (attorney's fee) the cause is remanded for further proceedings. In the meantime further payment is stayed. Affirmed in all other respects as to each case.

Robins, J. (dissenting). I respectfully dissent from that portion of the majority opinion in this case in which it is held that the estate of B. L. Gocio is the owner of note No. 38 for $38,000 executed by Rose Bluhm and Henry Bluhm. In my opinion, the fact that this note was

the property of appellant was established by the great preponderance of the competent testimony.

I am authorized to state that Mr. Justice McHANEY and Mr. Justice HOLT join in this dissent.